# DECLARATION OF THOMAS GUTHRIE

I, Thomas Guthrie, do hereby declare:

## Introduction and Agent Background

1. I am a Special Agent employed by the Internal Revenue Service (IRS), Criminal Investigation, and have held this position for approximately one year. I have successfully completed the Criminal Investigator Training Program at the Federal Law Enforcement Training Center and the Internal Revenue Service Basic Training course. During this time, I have either conducted or been involved in investigations concerning Title 26 (Income Tax) and Title 18 (Conspiracy and Money Laundering). I have participated in the execution of several federal search warrants involving criminal income tax charges, money laundering, and other criminal activities during which evidence of criminal violations was seized. I am being assisted by Special Agent Scott McGeachy from the Internal Revenue Service who has predominantly worked investigations involving narcotics trafficking and money laundering.

2. This declaration is submitted in support of the complaint seeking in rem forfeiture of the following:

- a parcel of real property located at **10820 NE 119th Place, Vancouver, Washington 98662 (hereinafter, "Defendant Real Property")** including the lot or tract of land and any appurtenances or improvements; and

- approximately **$303,844.45 in rental proceeds** generated from other properties associated with Zalin Adair Requejo Lopez or Jaqueline Paola Rodriguez Barrientos **(hereinafter "Defendant Rental Proceeds")**.

**Declaration of Thomas Guthrie**                                  EXHIBIT A   PAGE 1
                                                                   Complaint *In Rem*
                                                                   FOR FORFEITURE

3. As set forth below/above, there is probable cause to believe, and I do believe, that **Defendant Real Property** and **Rental Proceeds** described above represents proceeds traceable to drug trafficking in violation of 21 U.S.C. § 841; I further believe **Defendant Real Property** and **Rental Proceeds** were involved in money laundering transactions, some of which were conducted with more than $10,000 of criminally derived property, and which were designed to conceal and disguise the true source of the funds in violation of 18 U.S.C. §§ 1956(a)(l)(B)(i) and 1957. The **Defendant Real Property** and **Rental Proceeds** are therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(l)(A) and (a)(1)(C), and 21 U.S.C. § 881(a)(6).

4. This declaration is intended to show only that there is sufficient probable cause for the requested complaint and does not set forth all my knowledge about this matter. The facts set forth in this declaration are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, wire intercepts, a review of records related to this investigation, communications with others who have knowledge of the events and circumstances described herein, and information gained through my training and experience.

**Investigative Overview**

5. In October 2021, Drug Enforcement Administration, Portland District Office Group D-51, in conjunction with the Federal Bureau of Investigations, Homeland Security Investigations, Tigard Police Department, Internal Revenue Service, and Oregon State Police (hereinafter "Investigators") began investigating a Drug Trafficking Organization (hereinafter, "the Arredondo DTO") led by Luis Beltran Arredondo (hereinafter, "BELTRAN") that was allegedly importing methamphetamine, heroin, and counterfeit oxycodone pills containing

fentanyl from Mexico into California and transporting it for distribution in Oregon and Washington.

6. The investigation revealed evidence of structuring and money laundering by members of the Arredondo DTO. Specifically, Jaqueline Paola Rodriguez Barrientos (hereinafter, "Jaqueline") and Zalin Adair Requejo Lopez (hereinafter, "Zalin") were the primary money laundering arm for the Arredondo DTO. Jaqueline and Zalin enacted several methods to launder the Arredondo DTO's drug proceeds including: (1) making multiple cash deposits through ATM machines in an attempt to structure illicit drug proceeds into the banking system designed to avoid the filing of a Currency Transaction Report (CTR), (2) conducting singular cash deposits under $10,000 to avoid the filing of CTRs, (3) making large cash deposits in excess of $10,000 cash inconsistent with legitimate earnings, (4) laundering drug proceeds through a local beauty salon to provide the appearance of legitimate earnings, and (5) purchasing cashier's checks and/or wiring funds for the purchase of real estate and titling the real estate in nominee and/or corporate names designed to conceal and disguise the true ownership of the real estate.

7. The investigation included wiretaps on phones used by BELTRAN, the leader of the DTO, as well as two of his sub-distributors. Between October 2021 and February 2022, Investigators interdicted couriers and seized drugs and proceeds from locations across three states. In total, Investigators seized approximately forty-one pounds of methamphetamine, twenty-six kilograms of heroin, 115,000 counterfeit oxycodone pills containing fentanyl, as well as more than $348,000 in cash.

8. On September 5, 2025, BELTRAN was sentenced to 135 months of imprisonment for violations of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(i) and 846, Conspiracy to Possess with Intent to Distribute and to Distribute Heroin and Fentanyl and 18 U.S.C. § 1956(h), Conspiracy to

Launder Drug Proceeds. BELTRAN was the leader of the Arredondo DTO, and his drug proceeds were used to purchase real property including the **Defendant Real Property** and associated rental properties that generated the **Rental Proceeds**, which were titled in Jaqueline and Zalin's names. As part of BELTRAN's, Jaqueline's, and Zalin's plea agreements they all agreed to forfeit all right, title, and interest in and to the **Defendant Real Property** and associated rental properties that generated the **Rental Proceeds**.

9. On October 23, 2024, Jaqueline was sentenced to 57 months of imprisonment for violations of 18 U.S.C. § 1956(h), Conspiracy to Launder Drug Proceeds. Jaqueline made numerous cash deposits for the purchase of real estate associated to the DTO, including for the purchase of the **Defendant Real Property** and associated rental properties that generated the **Rental Proceeds**.

10. On April 30, 2025, Zalin was sentenced three years of probation for violations of 31 U.S.C. §§ 5324(a)(3) and 5324(d), Structuring Transactions with a Domestic Financial Institution to Evade Reporting Requirements. As part of this investigation, Zalin deposited cash into bank accounts for the purchase of the **Defendant Real Property**. Zalin worked together with Jaqueline to launder drug proceeds and purchase cashier's checks to purchase the real property, which they titled in their names to conceal and disguise the true owner of the real estate.

### A. Financial Investigation Identifies Millions of Dollars of Drug Proceeds

11. CTRs show Jaqueline made exceptionally large cash deposits into bank accounts held in her name or in the name of Mazatlan Beauty Salon. These individual cash deposits ranged from $10,000 to $373,771. The cash deposits were inconsistent with money generated from a beauty salon (which was the purported legitimate employment of Jaqueline), particularly

during the COVID-19 pandemic. When making cash deposits at banks, Jaqueline sometimes listed her occupation as owner/operator of a beauty salon, and the cash deposits continued for more than a year after the Mazatlan Beauty Salon LLC's May 2020 dissolution.

12. In aggregate, CTRs show that Jaqueline made more than $3.5 million in cash deposits into her accounts between January 11 and October 12, 2021. This is a significant undercount of the total cash flowing through Jaqueline's bank accounts during this period as CTRs are not generated for cash deposits of $10,000 or less. It also does not account for cash earned by the DTO that was not deposited into the banking system.

13. As previously mentioned, BELTRAN and Jaqueline funneled some of their illicit proceeds into real estate. Acting at BELTRAN's direction, Jaqueline bought eight properties in 2021 totaling more than $4.3 million, all in cash, including jointly purchasing with Zalin the **Defendant Real Property** and the rental properties that generated the **Rental Proceeds**. Jaqueline and Zalin purchased the properties outright, with no mortgages. Zalin purchased another property in his name in addition to the eight properties purchased with Jaqueline. Investigators identified Zalin as the nephew of Jaqueline.

### B. Cash Deposits Linked to Purchase of Real Property

14. Investigators conducted a review of CTRs and bank records related to Jaqueline for the time period of January 1, 2021, through January 13, 2022.[1] Jaqueline had bank accounts

---

[1] It should be noted that the filing of CTR's reflected below may not reflect the actual financial transaction. For instance, a CTR filed for $18,000 might actually be two separate cash deposits made on the same day or within one day of each other for $9,000 a piece. A financial institution's anti-money laundering software oftentimes generates a CTR for $18,000, but the actual financial transaction is two separate and distinct deposits. Thus, the CTR's listed below provide a general snapshot of the activity, but the underlying financial documents provide a precise accounting.

with Bank of America, Key Bank, and Wells Fargo, which she used to deposit cash and to purchase cashier's checks used for the purchase of property. Investigators identified several instances of deposits that seem inconsistent with proceeds of a hair salon and consistent with a large scale drug trafficking organization such as (1) cash deposits ranging from $1,500 to $373,771, (2) structured cash deposits under $10,000 on the same day or in close proximity, (3) cash deposits being split between personal bank account and hair salon account, (4) cash deposits split between different financial institutions on the same day, (5) cash deposits split between Jaqueline and Zalin, (6) cash deposits made in round, whole numbers inconsistent with business deposits, (7) multiple ATM cash deposits on the same day structured under $10,000 and (8) rapid movement of cash through bank accounts to purchase cashier's checks or to wire transfer funds for the purchase of real estate. For all these reasons as well as based on my training and experience, I believe the cash deposits are inconsistent with the operation of a beauty salon and/or legitimate property rental companies but are consistent with laundering drug proceeds.

15. Investigators reviewed CTRs filed on Zalin for the time period of January 11, 2021, through February 25, 2021, and noted total cash deposits of $242,992. Zalin's employment was listed as Office Assistant or Assembler Manufacturing. Investigators also reviewed a Resident Information Sheet from MG Properties Group (rental application). Zalin provided MG Properties Group with a copy of his pay stub for the time period of February 16, 2020, through February 29, 2020, which noted his hourly rate at $13.00 per hour and total hours of 72.19 for total earnings for two weeks of $938.47. Investigators believe Zalin's legitimate earnings are inconsistent with the cash deposits into his Key Bank and Bank of America accounts that were used to purchase real estate. **Chart 1**, below, shows the CTRs filed on Zalin.

| CHART 1 Date | Depositor | Amount | Cashier's Check | Listed Employment | Deposit Location | Bank |
|---|---|---|---|---|---|---|
| January 11, 2021 | Zalin Lopez | $50,640 | | | Tualatin | Key Bank |
| January 11, 2021 | Zalin Lopez | $16,850 | | | Wilsonville | Key Bank |
| January 11, 2021 | Zalin Lopez | $9,940 | | Office Assistant | Wilsonville | Bank of America |
| January 11, 2021 | Zalin Lopez | $29,060 | | Office Assistant | Wilsonville | Bank of America |
| February 19, 2021 | Zalin Lopez | $66,502 | Yes | Assembler | Wilsonville | Key Bank |
| February 25, 2021 | Zalin Lopez | $30,000 | Yes | Assembler | Wilsonville | Key Bank |
| February 25, 2021 | Zalin Lopez | $40,000 | Yes | Assembler Manufacturing | Wilsonville | Bank of America |
| | | | | | | |
| Total | | $242,992 | | | | |

**E. Investigators Trace Cash Deposits to Purchase of Real Property**

16. Investigators reviewed the Fidelity Title escrow file for Jaqueline and Zalin's purchase of the **Defendant Real Property** on or about February 12, 2021, for $370,000. On January 20, 2021, Jaqueline purchased a Bank of America Cashier's Check ending in 1701 for $5,000 as earnest money. On February 19, 2021, Jaqueline purchased a Bank of America Cashier's Check ending in 1778 for $150,000. Also on February 19, 2021, Jaqueline purchased a Wells Fargo Bank Cashier's Check ending in 1866 for $150,000. On February 19, 2021, Zalin purchased a Key Bank Cashier's Check ending in 8362 for $66,498.24 to complete the purchase of the **Defendant Real Property**.

///

| SUMMARY OF CASHIERS CHECKS[2] | | |
|---|---|---|
| Purchase Date | Amount | Cashier's Check ending in # |
| January 20, 2021 | $5,000 | Bank of America #1701 |
| February 19, 2021 | $150,000 | Bank of America #1778 |
| February 19, 2021 | $150,000 | Wells Fargo #1866 |
| February 19, 2021 | $66,498.24 | Key Bank #8362 |
| TOTAL | $371,498.24 | |

17.     The source of the monies to purchase **Defendant Real Property** originated from cash. I believe based on the facts contained in this Declaration, these monies represent drug proceeds used to purchase the cashier's checks to buy the **Defendant Real Property**. As noted in **Chart 1**, Key Bank filed a CTR for a cash deposit to Zalin's Key Bank account ending in 7675 on February 19, 2021, for $66,502, which I believe represents drug proceeds of the Arredondo DTO.[3]

### F. Properties Generating Rental Proceeds

18.      In Jaqueline's plea agreement she admitted to being a member of a conspiracy to launder more than $4.3 million in cash by depositing it into her bank accounts and using it to buy real estate in Oregon and elsewhere. The properties were purchased in full, with no loans or mortgages. Jaqueline admitted to forming a separate LLC for each property, which she leased out to third party tenants and used to collect rental income. Jaqueline used separate LLCs for each

---

[2] Both cash and cash deposited into bank accounts were used for the purchase of cashier's checks. Not all monies from cashier's checks were deposited into a bank account.

[3] The difference between the CTR filed on Zalin for $66,502 and the cashier's check purchased of $66,498.24 is likely due to nominal fees incurred to purchase the cashier's check and/or last-minute accounting changes in escrow.

**Declaration of Thomas Guthrie**                                              EXHIBIT A   PAGE 8
                                                                                                       Complaint *In Rem*
                                                                                                       FOR FORFEITURE

property to further conceal and disguise her association to the drug proceeds used to purchase the real estate and provide the appearance of legitimate income generating rental properties.

19. In the plea agreement, Jaqueline agreed she was deliberately ignorant that the source of this money used to purchase the properties was proceeds derived from drug trafficking. Jaqueline further agreed she deliberately avoided investigating the source of the money, had she done so, she would have determined that there was a high probability that the funds were illegally derived from drug trafficking.

20. On July 31, 2024, the Court entered a Preliminary Order of Forfeiture for Jaqueline's interest in the properties that generated the **Rental Proceeds**. 3:22-cr-00045, ECF 484. The rental properties continued to be leased to third party tenants and managed by InterWest Properties, Inc. with the **Rental Proceeds** held in escrow pending the forfeiture.

21. The United States obtained a Final Order of Forfeiture for the properties generating the **Rental Proceeds** and title for those properties transferred to the United States government. As of December 15, 2025, approximately $ 303,844.45 of **Rental Proceeds** is held in escrow, which the government seeks to forfeit as proceeds of drug trafficking and money laundering.

## CONCLUSION

22. As set forth below/above, there is probable cause to believe, and I do believe, that the **Subject Real Property** and **Rental Proceeds** described above represents proceeds traceable to drug trafficking in violation of 21 U.S.C. § 841 and was also involved in money laundering transactions, some of which were conducted with more than $10,000 of criminally derived property, and which were designed to conceal and disguise the true source of the funds in violation of 18 U.S.C. §§ 1956(a)(l)(B)(i) and 1957. The **Subject Real Property** and **Rental**

**Proceeds** are therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) and (a)(1)(C) and 21 U.S.C. § 881(a)(6).

I declare under penalty of perjury that the foregoing is true and correct pursuant to 28 U.S.C. §1746.

Executed this 15th day of January 2026.

>   */s/ Thomas Guthrie*
>   THOMAS GUTHRIE
>   Special Agent, IRS Criminal Investigation